IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

LASHUNDA E. EDWARDS,
      Plaintiff,

vs.                                  Case No.: 5:12cv124/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]
      Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 8, 9). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

I.      PROCEDURAL HISTORY

On February 27, 2007, Plaintiff filed applications for DIB and SSI, and in each application she alleged disability beginning November 1, 2004 (tr. 11).[2] Her applications were denied initially

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Michael J. Astrue as the Defendant in this case.

[2] All references to "tr." refer to the transcript of Social Security Administration record filed on July 12, 2012 (doc. 7). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

and on reconsideration, and thereafter she requested a hearing before an administrative law judge ("ALJ").  A hearing was held on May 17, 2010, and on May 28, 2010, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 11–21).  The Appeals Council subsequently denied Plaintiff's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

## II.     FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* tr. 11–21):

(a)     Plaintiff meets the insured requirements of the Act, for DIB purposes, through September 30, 2009[3];

(b)     Plaintiff has not engaged in substantial gainful activity since November 1, 2004, the date she alleges she became disabled;

(c)     Plaintiff has one severe impairment, degenerative disc disease of the lumbar spine, status post diskectomy in June of 2005, and one non-severe mental impairment (depression), but she has no impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(d)     Plaintiff has the residual functional capacity ("RFC") to perform sedentary work with certain restrictions;

(e)     Plaintiff cannot perform her past relevant work because that work was performed at light, medium, and heavy levels of exertion, but Plaintiff can perform other available work which accommodates her RFC and other factors; thus, she is not disabled.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by

---

[3] Thus, the time frame relevant to Plaintiff's claim for DIB is November 1, 2004 (date of alleged onset), through September 30, 2009 (date last insured).  The time frame relevant to her claim for SSI is February 27, 2007 (the date she applied for SSI) through May 28, 2010 (the date the ALJ issued his decision).  *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).

substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g),[4] the Commissioner analyzes a disability claim in five steps:

---

[4] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY[5]

A.      Personal History

Plaintiff was born on July 20, 1970, and was thirty-four years of age on the date she alleges she became disabled. Plaintiff previously worked as a fast food worker, sign erector, and nurse assistant (tr. 19, 38). She sustained a work-related injury at an assisted care facility in late March 2004, when she trying to lift a patient out of a bed (tr. 15–16, 18, 38–39). This injury ultimately resulted in a diagnosis of lumbar radiculopathy and led to a L4-5 diskectomy in June 2005 (tr. 15–16, 18).

---

[5] Unless otherwise noted, the information in this section is derived from the ALJ's opinion (*see* tr. 15–18).

B.      Relevant Medical History

Following Plaintiff's work-related injury, she was treated by a chiropractor and initially assessed with lumbar strain.  Magnetic resonance imaging ("MRI") of the lumbar spine was obtained in September of 2004, however, which showed a disc herniation at L4-5 (tr. 262).  Additionally, electromyogram ("EMG") studies from October 2004 showed a posterior primary rami nerve root irritation, primarily in the L4-5 region, consistent with radiculopathy (tr. 267).  Nerve conduction studies of the left lower extremity were normal (*id.*).[6]

Karin S. Maddox, M.D., a neurologist with the Brain & Spine Center, began treating Plaintiff in December 2004 (tr. 301).  Plaintiff complained of lower back pain that radiated into the left leg and caused numbness and tingling in the leg (*id.*).  Dr. Maddox administered lumbar epidural steroid injections, but the injections were only minimally successful (and, apparently, other conservative treatment measures failed as well).  Plaintiff underwent a L4-5 diskectomy on June 21, 2005.

Plaintiff followed up with Dr. Maddox on August 16, 2005, and reported feeling somewhat better but noted she still had some back and left leg pain.  Dr. Maddox observed that Plaintiff walked with an antalgic gait (tr. 298).  In November 2005, Plaintiff reported back pain with radiation but stated that Lortab was helping.  An examination revealed tenderness to palpation of the lumbar spine and an antalgic gait, but strength was full ("5/5") in all extremities and sensory was intact to light touch and pinprick.  Dr. Maddox noted Plaintiff was not at maximum medical improvement ("MMI") and decided a repeat lumbar MRI was in order (tr. 297).  On February 6, 2006, Plaintiff reported extreme, radiating low back pain and stated her surgery did "not help at all"; she also reported extreme difficulty "even getting up in the morning" and stated her life had drastically changed as a result of her pain (*see* tr. 296).  Examination revealed tenderness to palpation of the lumbar spine, decreased lumbar range of motion ("ROM"), a positive straight leg raising test on the left, and an antalgic gait (tr. 295–97).

Plaintiff obtained another lumbar MRI on February 17, 2006.  It revealed a moderately wide disc extrusion at L4-5 that was causing significant neural deformity, primarily affecting the left L5 nerve root; partial sacralization of L5; mild DDD at T11-12, without herniation; and mild facet

---

[6] At the time of these studies, Plaintiff, who is 5'9" tall, weighed 250 pounds (tr. 269).

degeneration at L2-3 and L3-4 (tr. 388–89). Plaintiff followed up with Dr. Maddox on February 20, 2006, and stated she was doing better with a Medrol Dosepak, Cymbalta, and pain medication, although she continued to have back pain (tr. 294–95).[7] Plaintiff also reported she had begun physical therapy, which had "helped her tremendously" (tr. 294). An examination revealed, in pertinent part, tenderness to palpation of the lumbar spine and decreased ROM (tr. 294). Dr. Maddox assessed lumbar radiculopathy (*id.*). Dr. Maddox's treatment records from March 15, 2006, reflect her discomfort (and/or ARNP Breland's discomfort) with the idea of releasing Plaintiff to work without a surgical consultation (tr. 292). Examination revealed decreased lumbar ROM and pain with hyperextension and flexion, although at this visit Plaintiff's gait was normal (*id.*). Dr. Maddox assessed lumbar radiculopathy and advised Plaintiff to continue physical therapy (tr. 291–92). An examination in April 2006 was essentially the same, although Plaintiff's gait was noted to be antalgic (tr. 289). In May 2006, Dr. Maddox again opined that Plaintiff had not reached MMI and continued to assess lumbar radiculopathy, and in doing so she noted the MRI results from February 2006 (tr. 286). Dr. Maddox's treatment notes from June and July 2006 are essentially the same, although in July Dr. Maddox definitively stated Plaintiff was "unable to work" (tr. 283–85). In August Plaintiff reported continued low back pain with worsening symptoms, such as bilateral radiculopathy and loss of strength in both lower extremities (tr. 281). Additionally, Plaintiff's weight had increased to 323 pounds (*id.*).[8] Examination revealed full strength in all extremities and a normal gait, but Plaintiff displayed reduced lumbar ROM and tenderness to palaption (*id.*). Dr. Maddox assessed lumbar radiculopathy (*id.*). In September 2006, Plaintiff presented with a cane and stated it was necessary for ambulation (tr. 280). Dr. Maddox commented that Plaintiff's gait

---

[7] Beginning with the February 20, 2006, treatment record, and continuing through approximately mid-June of 2007, Dr. Maddox's records contain a signature line that states "Stephanie Breland, ARNP-C [Advanced Registered Nurse Practitioner - Certified] for Karin S. Maddox, M.D.," but the records nevertheless bear signatures that read "Karin Maddox" (*see, e.g.*, tr. 295, 291, 288). However, some of the signatures differ (*compare, e.g.,* tr. 288 *with* tr. 291). It thus seems that on occasion someone may have signed the records for Dr. Maddox. Regardless of who signed the records, however, they appear to reflect the opinions of Dr. Maddox (either directly, because they are signed by her, or indirectly, because she appears to have concurred with or adopted the opinions of ARNP Breland). Some of Dr. Maddox's more recent treatment records contain signatures lines for both ARNP Breland and Dr. Maddox and bear each of their signatures (*see, e.g.*, tr. 345, 347). The undersigned will refer to all of the records as being those of Dr. Maddox.

[8] As noted *supra*, in October 2004 Plaintiff weighed 250 pounds. Thus, in less than two years she gained seventy-three pounds.

was "extremely antalgic" (*id.*). Dr. Maddox indicated she would refer Plaintiff for a surgical consultation and schedule lumbar facet injections (*id.*). October 2006, Plaintiff again reported low back pain with bilateral radiculopathy (tr. 278). Dr. Maddox noted "positive numbness and tingling as well as muscle spasms" (*id.*). Dr. Maddox advised Plaintiff that "narcotic medication is potentially addicting and [Plaintiff was] to take as little of this . . . as possible to control the pain" (tr. 277). On November 14, 2006, Plaintiff stated she was progressively getting worse, and she stated that "now her left leg gives out on her a lot of the time" (tr. 276). She also reported she was depressed because "everything [was] falling apart," and she was upset because her children were in Arizona and she had planned to move there to be with them but now was unable to do so (*id.*). In short, Plaintiff said she was upset because she used to work and have money, but she was now dependant on her mother, and her "whole way of life" had changed (*id.*). Dr. Maddox stated she would refer Plaintiff to a counselor (tr. 275). She again stated Plaintiff had not reached MMI (tr. 276). Treatment notes from December 2006 are essentially the same (tr. 273–74). On January 17, 2007, Plaintiff reported continued low back pain with radiation and worsening symptoms, as well as depression (tr. 272). Examination revealed decreased lumbar ROM, tenderness to palpation of the lumbar spine, and an antalgic gait (*id.*). Dr. Maddox stated she would refer Plaintiff for to a surgeon to administer lumbar facet injections (tr. 356). Notes from a visit with Dr. Maddox in February 2007 are essentially the same, although at this visit Dr. Maddox administered a Toradol injection "for immediate [pain] relief" (tr. 354–55). Dr. Maddox continued to assess lumbar radiculopathy throughout Plaintiff's treatment (*see* 274, 275, 351, 440).

On March 12, 2007, Plaintiff was evaluated by C.W. Koulisis, M.D., an orthopedist, in connection with her claim for Workers' Compensation benefits (*see* tr. 304–06). Dr. Koulisis noted Plaintiff's subjective complaints of severe pain and resulting limitations, and he reviewed the results of her October 2004 EMG studies and February 2006 lumbar MRI (tr. 304). Examination revealed the following: (1) reduced ROM in the lumbar spine and decreased sensation to light touch and pinprick at L5; (2) a positive straight leg raising test and pain with testing on the left; (3) a slow and deliberate gait; and (4) an ability to tandem walk, heel walk, and toe walk (tr. 305). Dr. Koulisis diagnosed status post L4-5 disc herniation with recurrent herniation and recommended a repeat MRI of the lumbar spine (tr. 305–06).

Plaintiff returned to Dr. Maddox on March 14, 2007, at which time she reported similar symptoms as before, but—for the first time—she also reported urinary incontinence (tr. 353). Dr. Maddox assessed lumbar radiculopathy (tr. 352). Dr. Maddox also commented that Plaintiff seemed more depressed, and she recommended psychiatric care and/or counseling (*id.*).

Pursuant to Dr. Koulisis' recommendation, an MRI of the lumbar spine was obtained on April 3, 2007 (tr. 386–87). The MRI revealed that the posterior disc herniation had decreased in size since the February 2006 MRI. It was noted to be "most characteristic of [an] extrusion, but [] smaller than on the previous [MRI]" and "slightly more prominent to the left of the midline" with less obvious asymmetry than before (tr. 386). Additionally, a mild deformity of the thecal sac was observed, as well as mild perineural fibrosis involving the L5 nerve root and partial sacralization of L5, more obvious on the right (*id.*). The L4-5 disc degeneration had progressed slightly since the previous study, and more bony edema was present in the adjacent endplates. Finally, a small posterior disc bulge was noted at T11-12, which was mildly degenerated.

Plaintiff returned to Dr. Maddox on April 12, 2007 (tr. 351). Dr. Maddox noted that the recent MRI revealed that the herniated disc at L4-L5 had decreased in size, but the disc had narrowed (*id.*). Dr. Maddox assessed lumbar radiculopathy and depression (*id.*). In May, Dr. Maddox expressed concern that Plaintiff was not taking the Lortab she prescribed (tr. 349). In June, Plaintiff told Dr. Maddox she had seen "the surgeon in Crestview," and he stated she did not need surgery[9] (tr. 348). In July 2007 Dr. Maddox noted Plaintiff "has not been back to see the counselor or the psychiatrist for her treatment of her depression" and that "Worker's Compensation has not yet approved sacroiliac or lumbar facet injections" (tr. 346). Dr. Maddox opined that Plaintiff was "unable to work" and had not reached MMI (*id.*), as she did again in October 2007 (tr. 443). Also in October 2007, Plaintiff denied urinary incontinence and stated that although her pain was severe at times, she had "weaned herself off Lortab" and functioned better without it (*id.*). Dr. Maddox administered Demerol and Toradol injections and assessed lumbar radiculopathy and depression (tr. 442).

---

[9] Plaintiff presumably was referring to Dr. Koulisis, as he is an orthopedic surgeon with an office in Crestview, Florida (*see* tr. 304). Dr. Koulisis' notes, however, do not reflect an opinion that Plaintiff needed—or did not need—surgery (*see* tr. 304–06). He merely recommended that Plaintiff obtain a repeat lumber MRI and return to see him once it was obtained (*see* tr. 306).

In September 2007, Dr. Maddox completed a motor deficit questionnaire (tr. 404). Dr. Maddox stated that Plaintiff had difficulty walking and difficulty with gross movement of her bilateral lower extremities due to a "large herniated disc in the lower lumbar spine" (*id.*). She opined that Plaintiff's strength was decreased (at "3/5"), bilaterally, in the lower extremities and that Plaintiff's station was normal, but her gait was antalgic (*id.*). She further opined that Plaintiff could not squat, walk on her toes, or walk on her heels, and that "at times" Plaintiff needed to use a cane to keep from falling (*id.*).

On November 14, 2007, Plaintiff was examined by Michael W. Reed, M.D., an orthopedic surgeon (tr. 473–76). He noted that since Plaintiff's work-related injury she sought "medical treatment consisting of physical therapy, chiropractic care, . . . medication[s], low back exercises, being off work with rest at home, [and] restricted work status," all of which "provided good response" (tr. 473). Dr. Reed also noted initially that Plaintiff had "not" had surgery (tr. 473), but he stated elsewhere she had surgery in 2006 (tr. 474). After examining Plaintiff and reviewing the most recent lumbar MRI, Dr. Reed assessed degenerative disc disease at L4-5 and L5-S1, with modic endplate changes at L4-5 (tr. 476). He stated Plaintiff "may be a candidate for interbody fusion at L4-L5 and L5-S1," but he strongly recommended that Plaintiff lose weight before undergoing fusion surgery (*id.*). In the meantime, Dr. Reed opined, Plaintiff may be a candidate for a discography (*id.*).

Plaintiff returned to Dr. Maddox in December 2007 and stated that Dr. Reed recommended surgery, but he advised her she would have to lose weight before he would perform it (tr. 441). Dr. Maddox advised Plaintiff to continue seeing Dr. Reed and to return to her on a two-month interval (instead of a one-month interval, as done previously) (tr. 440). Dr. Maddox assessed lumbar radiculopathy (but did not assess depression) (*id.*). Plaintiff returned in February 2008 as directed (tr. 439). She stated she was attending a community college. She also reported severe and shooting pain that could not be controlled with medication but denied bladder incontinence (*id.*). In March 2008, Plaintiff reported continued pain and—at times—worsened symptoms (*see* tr. 437). Dr. Maddox administered a Toradol injection, assessed lumbar radiculopathy, prescribed Percocet, and advised Plaintiff to return in one month (tr. 436). In April Plaintiff reported she would be flying to Arizona to attend her son's graduation (tr. 435). Treatment notes through the end of 2008 are not

remarkably different.  Plaintiff continued to report pain with radiation into her legs, as well as numbness and tingling down the left lower extremity, and Dr. Maddox continued to assess lumbar radiculopathy (*see, e.g.*, tr. 431, 438).

A lumbar MRI from December 10, 2008, revealed facet arthropathy and disc herniation at L4-5, although the herniation was less apparent on this MRI when compared with the 2007 MRI (tr. 429, 470).  A reviewing radiologist also observed what appeared to be "a broad-base residual annular disk bulge with bright signal in the annular fibers, consistent with an annular tear" at L4-5, as well as "early bilateral foraminal encroachment with contributions from the broad-base residual disk bulge" (tr. 470).

EMG studies obtained on April 3, 2009, were normal and revealed no evidence of lumbosacral radiculopathy (tr. 457).  In August 2009 Dr. Maddox recommended additional diagnostic studies of the lumbar spine and advised Plaintiff to return after those had been obtained (tr. 426).

On September 28, 2009, Plaintiff underwent a consultative examination by E. Jacob, M.D., a neurologist, at the Commissioner's request (tr. 415–17).  Dr. Jacob noted Plaintiff's subjective complaints of pain, which are similar to those she reported to Dr. Maddox (*see* tr. 415).  Examination of the lumbar spine revealed no tenderness over the spinous process and no paravertebral muscle spasms  (tr. 416).  Plaintiff could not bend, and straight leg raising tests were positive bilaterally[10] (*id.*).  Plaintiff could, however,  toe  walk, heel walk, and tandem walk, and her sensory examination  was normal (tr. 417).  Dr. Jacob assessed history of back injury; history of low back surgery; "overweight, over 300 pounds"; and elevated blood pressure (*id.*).  Dr. Jacob completed a RFC assessment form, on which he opined in pertinent part that Plaintiff could not work a full, eight-hour workday.  More specifically, he opined she could sit four hours, in one-hour intervals; stand one hour, in twenty to thirty-minute intervals; and walk one hour, in ten-minute intervals due to lower back pain and obesity[11] (tr. 419).  Dr. Jacob noted that Plaintiff used a cane,

---

[10] Dr. Jacob noted that the "restrictions may be due to the protruding abdomen" (tr. 416).

[11] Dr. Jacob inserted a question mark ("?") next to his opinion that Plaintiff could walk a total of one hour in a workday; he did the same next to his opinions as to the amount of weight Plaintiff could lift or carry (*see* tr. 417–19). Even if no question marks had been placed by Dr. Jacob's opinions, and his opinions are construed as being definitive, the opinions reflect that Plaintiff can work no more than six hours, total, in an eight-hour workday.

but he stated he did not "think she needs one" (*id.*). He also noted that she drove a "fairly large SUV/truck" and could "get in and out of [it]" (tr. 419–20). Dr. Jacob opined that Plaintiff could perform all activities of daily living, and occasionally climb stairs and ramps, and balance, but she could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl due to obesity (tr. 421). He stated Plaintiff had gained over 100 pounds since her back injury and that her obesity and back pain are "responsible for [the] limitations" he assessed (tr. 422).

     C.      Other Information Within Plaintiff's Claim File

     At Plaintiff's hearing, held May 17, 2010, she testified she had gained weight in the last two years due to inactivity (tr. 35–36). She noted she is able to drive but does not drive often (tr. 36). She stated she lives with her mother and on a average day does not "do too much" and stays at home (tr. 44). She can shop, but only if she can park close to the store and "get a shopping cart to hold on to"; she can walk to the mailbox; and she can take a shower, but only by sitting on the side of the tub or in a shower chair (tr. 47, 49, 196, 207). She reported she is unable to work due to back pain, which prevents her from lifting, standing long periods, or walking long distances (tr. 39, 47). She stated she gets muscle spasms in her legs, and her legs are painful and tingly, which occasionally causes her to fall when she is walking or attempting to walk (*see* tr. 48, 46). She described her back pain as "constant" and rated its intensity at an eight on a ten-point scale ("8/10") (tr. 47). Plaintiff testified that the June 2005 diskectomy did not "help," and she noted that in or about April 2010 she underwent radiofrequency treatment (tr. 40). She also stated she received injections, which did not help and made her sleepy (tr. 41). She reported previously being prescribed and taking a host of medications, but she "got tired" of taking them and noted "they had me on so much" (*id.*). At the time of her hearing she was using only over-the-counter pain medications, including Goody powders and Tylenol, and she was seeing Dr. Maddox approximately once every six months (tr. 41–42). According to Plaintiff, Dr. Maddox told her she had the "wrong" kind of back surgery in 2005 and recommended that she undergo the "right" type of surgery, but Plaintiff stated she did not want to undergo another surgery (tr. 42). She reported she had simply learned to "deal with the pain" (*id.*). She reiterated that she cannot walk long distances, and even when she walks short distances she feels "knots in [her] back" (*id.*). She stated she cannot stand or sit for long periods, although she

could not estimate how long she can stand or sit, and she cannot bend or (generally) lift without causing debilitating pain (*see* tr. 46–50). She apparently can, however, lift a gallon of milk on occasion (tr. 46). When pressed to estimate how long she can walk, Plaintiff responded by stating it would be less than the length of "a football field" (*id.*).

Plaintiff noted she "was supposed to" be taking anti-depressant medications but was not doing so because she "couldn't function with them," and they were "weighing her down" (tr. 43–44). When the ALJ asked Plaintiff whether she had received treatment for depression, she stated she "went through counseling . . . maybe a year or two -- a year ago maybe" (tr. 43).

Finally, a vocational expert ("VE") testified at Plaintiff's hearing. In summary, the VE testified that a hypothetical person with Plaintiff's RFC could not perform her past relevant work (tr. 51). The person could, however, perform other available work such as paramutual ticket checker,

surveillance system monitor, and hand sander, all of which are performed at the sedentary level of exertion and otherwise accommodate Plaintiff's RFC (tr. 52).

V.      DISCUSSION

Plaintiff contends the ALJ erred at step two of the sequential evaluation in failing to find her lumbar radiculopathy, obesity, and depression severe (doc. 13 at 11–12). She also alleges the ALJ erred in discounting her subjective complaints of pain (*id.* at 11).

A.      Step Two Findings

As previously noted, the ALJ determined that Plaintiff has one severe impairment, namely, degenerative disc disease of the lumbar spine, status post lumbar diskectomy in June 2005. Plaintiff contends the ALJ erred in failing to find any other impairment severe, including her lumbar radiculopathy. The Commissioner contends "there is no merit to Plaintiff's contention that her depression and obesity are [] severe impairments" (doc. 16 at 5). The Commissioner also, while not directly addressing Plaintiff's argument, appears to contend that any error in failing to find Plaintiff's lumbar radiculopathy severe is harmless, because the ALJ found her degenerative disc disease severe and accounted for any related limitations at subsequent levels of the sequential evaluation (*see id.* at 1–2, 14).

Any error in failing to find Plaintiff's lumbar radiculopathy severe is harmless because the ALJ found her degenerative disc disease severe. *See, e.g.*, Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 824 (11th Cir. 2010) (unpublished) ("Even if the ALJ erred in not indicating whether chronic pain syndrome was a severe impairment, the error was harmless because the ALJ concluded that Heatly had a severe impairment: and that finding is all that step two requires."). The same cannot be said, however, with regard to the ALJ's finding at step three.[12] At step three, in concluding that Plaintiff's degenerative disc disease does not meet or equal a listed impairment, the ALJ stated as follows (and only as follows):

> [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments . . . . Despite [Plaintiff's] combined impairments, the medical evidence does not document listing level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listing, individually or in combination.

(tr. 15) (emphasis omitted).

The ALJ did not indicate which musculoskeletal listing or listings he considered in making this step three determination (as he did in with regard to Plaintiff's depression (*see* tr. 14, referencing the paragraph A and B criteria of the Mental Disorder Listings (§ 12.00)). Similarly, the ALJ failed to discuss the particular evidence on which he relied at step three or explain why he reached his conclusion at step three. Instead, as can be seen *supra*, he summarily concluded that Plaintiff's degenerative disc disease does not meet or equal a listed impairment.

The ALJ's conclusory statement is similar to the "bare conclusion" the Tenth Circuit Court of Appeals found problematic in Clifton v. Chater, 79 F.3d 1007 (10th Cir. 1996). There, the court reversed a decision denying disability benefits because the ALJ "did not discuss the evidence or his reasons for determining that [the claimant] was not disabled at step three," but instead "merely stated a summary conclusion that [the claimant's] impairments did not meet or equal any Listed Impairment." Clifton, 79 F.3d at 1009 (also noting that the ALJ's "bare conclusion" was "beyond meaningful review"); *see also* Taylor v. Barnhart, 189 F. App'x 557, 561–62 (7th Cir. 2006) (unpublished) (reversing denial of benefits where ALJ "failed to conduct the proper analysis or

---

[12] In her memorandum before this court, Plaintiff does not assert any error with regard to the ALJ's finding at step three. The court nevertheless addresses this finding because it affects the remaining findings of the ALJ.

Case No.: 5:12cv124/EMT

provide sufficient justification for his findings after step 2 regarding Ms. Taylor's joint and spine problems," failed to identify "Listing 1.02A (joints) or 1.04A (spine) by name," and failed to "identify by name any other listing under which he considered whether Ms. Taylor's knee and spinal disorders constituted a disability") (citing Rice v. Barnhart, 384 F.3d 363, 368 (7th Cir. 2004) (in considering whether a claimant's condition meets a listed impairment, an ALJ must discuss the listing by name and offer "more than a perfunctory analysis" of the listing)); *see also* Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) ("[W]hen the ALJ fails to 'state with at least some measure of clarity the grounds for his decision,' we will decline to affirm 'simply because some rationale might have supported the ALJ's conclusion.'") (quoting Owens v. Heckler, 748 F.2d 1511, 1516 (11th Cir. 1984)).

Additionally, the ALJ's discussion of the medical evidence pertaining to Plaintiff's back impairment is at best equivocal in terms of showing whether she meets or equals any of the subsections of Listing 1.04.[13] Further, the ALJ's findings at steps four and five do not conclusively negate a claim that Plaintiff meets Listing 1.04, such that any error at step three may be deemed harmless. *Cf.* Fischer-Ross v. Barnhart, 431 F.3d 729, 730 (10th Cir. 2005) (distinguishing Clifton, 79 F.3d at 1007, declining to reverse denial of benefits, and noting that the ALJ's error—that is, his failure to discuss the particular evidence on which he relied to reach his step three conclusions—was harmless because "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review"). In short, the ALJ's failure here to even mention the musculoskeltal listings or otherwise explain why Plaintiff's impairment does not satisfy the listing(s) precludes meaningful review of his decision.

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find

---

[13] In pertinent part, the musculoskeletal listings provide that certain conditions, which may "cause weakness of the lower extremities . . . and [] should be evaluated under [Listing] 1.04 include . . . degenerative disc disease . . . ." 20 C.F.R. Part 404, Subpart P, Appendix 1 (§ 1.00). They further provide that, to meet the criteria of Listing 1.04, a claimant must have a disorder of the spine, such as degenerative disc disease, which results in the compromise of a nerve root (or the spinal cord) and "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Part 404, Subpart P, Appendix 1 (§ 1.04A).

facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. *See, e.g.*, <u>Davis v. Shalala</u>, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice). A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. <u>Davis</u>, 985 F.2d at 534; *see also* <u>Bowen v. Heckler</u>, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); <u>Carnes</u>, 936 F.2d at 1219 ("The record . . . is fully developed and there is no need to remand for additional evidence."). Here, it is not for this court to decide whether Plaintiff's back impairment meets the criteria of the appropriate musculoskeletal listing. Therefore, the case must be remanded for the ALJ to reevaluate Plaintiff's impairments at step three.[14] In doing so, the ALJ must identify the listing or listings considered at step three and set out his specific findings with regard to the criteria of the listing(s). Additionally, upon remand, the Commissioner may—with one exception—exercise her discretion to decide whether additional medical evidence or opinions should be obtained from either Plaintiff's treating physicians or consultative physicians in order to make the step three findings and other required disability determinations. The one exception to the Commissioner's discretion is this: if the Commissioner again decides to reject the opinions contained in Dr. Maddox's records, she may not do so—as the ALJ did here—based on a finding that the opinions were rendered by ARNP Breland <u>unless the Commissioner has contacted Dr. Maddox for clarification regarding who actually made the opinions</u>. While the undersigned acknowledges that ARNPs are not "acceptable medical source[s]," as the ALJ found (*see* tr. 18; 20 C.F.R. § 404.1513), Dr. Maddox's records are largely unclear as to who actually rendered the opinions. Thus, the ALJ's finding—that the opinions are those of ARNP Breland, and thus they are entitled to lesser weight—is not substantially supported by the record.

---

[14] The case must also be remanded because the evidence does not establish disability without a doubt or disability <u>for the entire time frames relevant to this appeal</u> (even if Plaintiff was disabled earlier on, the evidence suggests that her condition improved over time; however, whether (or when) it improved to the extent Plaintiff was no longer disabled is not clear and certainly not for this court to decide).

Because a reversal and remand for additional proceedings at step three is required, it is unnecessary to discuss Plaintiff's other contentions of error. The undersigned notes without deciding, though, that no other errors are apparent at step two or three of the sequential evaluation. The ALJ did err, however, in evaluating Plaintiff's subjective complaints of pain and other symptoms, which error the undersigned briefly addresses here in order to prevent a repeat of the same error upon remand.

B.      Evaluation of Plaintiff's Subjective Complaints

In <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991), the court articulated the "pain standard," which applies when a disability claimant attempts to establish a disability through his own testimony of pain or other subjective symptoms. The pain standard requires: (1) evidence of an underlying medical condition and either (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. <u>Holt</u>, 921 F.2d at 1223 (internal citation omitted). If a claimant testifies as to her subjective complaints of disabling pain and other symptoms, as Plaintiff did here, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations of completely disabling symptoms. <u>Foote</u>, 67 F.3d at 1561–62. Additionally, "'[a]lthough this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.'" *Id.* at 1562 (quoting <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1255 (11th Cir. 1983)). The credibility determination does not need to cite "'particular phrases or formulations'" but it cannot merely be a broad rejection which is "'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.'" *Id.* (quoting <u>Jamison v. Bowen</u>, 814 F.2d 585, 588–90 (11th Cir. 1987)).

Here, the ALJ articulated the correct pain standard (tr. 15). He then offered the following reasons for discounting Plaintiff's allegations of disabling limitations: (1) Plaintiff's "daily activities"—traveling to Arizona in 2009 to attend her son's graduation and attending community college classes in 2009—are inconsistent with Plaintiff's allegations and consistent with the RFC; (2) Plaintiff's care has been "essentially routine and/or conservative in nature"; (3) "[t]here is [some] evidence that [Plaintiff] needs to have additional surgery, [but she] doesn't want to have it done";

(4) "she has been prescribed and has taken appropriate medications . . . in the past, which weighs in [her] favor, but the medical records reveal that the medications were relatively effective in controlling [her] symptoms"; (5) Plaintiff weaned herself off of her medications and was using only over-the-counter medications at the time of her hearing; and (6) her appearance and demeanor at her hearing were "generally unpersuasive" (tr. 18).

The ALJ's reasons and, correspondingly, his credibility findings, are not supported by substantial evidence. With regard to the first reason, Plaintiff's activities in 2009 are not reflective of her abilities during a substantial portion of the relevant period. As previously noted, the time frame relevant to her claim for DIB is November 2004 through September 2009, and for her claim for SSI is late February 2007 through May 2010. What is more, Plaintiff's one-time trip to Arizona to attend her son's graduation does not necessarily undermine her complaints of disabling limitations, especially considering that she flew to Arizona, and it is well known that airlines accommodate travelers with disabilities and handicaps. Additionally, although Plaintiff reported she was attending college classes, there is no information in the record to demonstrate what this entailed. For example, the record—including the transcript of Plaintiff's administrative hearing, which is silent on the subject—does not reflect whether Plaintiff was a full-time student or a part-time student, how many classes she took, how long the classes were, or whether any accommodations were made for her. What is more, in June 2009 Plaintiff told Dr. Maddox she was "trying to go to school" but was having a "very difficult time in being able to maintain her academics" (tr. 428). Further, the record reflects consistent and repeated reports by Plaintiff that she could perform only minimal daily activities due to pain (*see, e.g.*, 196, 198, 207, 239). And, her dramatic weight gain during the relevant period is consistent with her reports of limited activity, even if she was able to attend college classes at some point during the relevant period.

The ALJ's second reason has some support in the record, but it does not have substantial support. A diskectomy can hardly be considered "routine" or "conservative" treatment. And, while it is fair to say that Plaintiff received treatment that was "essentially routine and/or conservative in nature" <u>after</u> the diskectomy, the record suggests that this treatment was palliative only. As the ALJ noted, the evidence indicates that Plaintiff needed an additional surgery, but there is no evidence establishing that the surgery would have restored Plaintiff's ability to work. More important, there is no evidence establishing that surgery was actually prescribed. To be sure, one of the last

physicians to speak on the subject, Dr. Reed, stated that Plaintiff "may" be a candidate for fusion surgery. *See* 20 C.F.R. § 404.1530 (Commissioner may consider failure to "follow treatment prescribed by [a claimant's] physician" unless good cause exists for failing to do so) (emphasis added).

As to the ALJ's fourth reason, the record does not clearly support a finding that Plaintiff's pain was managed with medications. Dr. Maddox prescribed pain medications for years, and at every visit Plaintiff reported continued, severe pain. Although the medications helped to a limited extent, the record simply does not support a finding that "the medications were relatively effective in controlling [her] symptoms" during the entire time frame relevant to this appeal. While it is true that Plaintiff ultimately weaned herself off of her medications and was using only over-the-counter medications at the time of her hearing (the ALJ's fifth reason), an objective reading of the record reflects that she did so because the medications were not providing significant relief, and she could not function while taking them due to their side effects. Even so, she did not discontinue the Lortab until mid-2007, nearly three years after her alleged onset date and the beginning of the time frame relevant to her claim for DIB. Also, Plaintiff had been repeatedly warned by Dr. Maddox that "narcotic medication is potentially addicting and [Plaintiff was] to take as little of this . . . as possible to control the pain" (*see, e.g.*, tr. 277, 430, 432, 434, 436, 440), which may have contributed to Plaintiff's decision to wean herself off the Lortab. But even after Plaintiff stated she had done so (*see, e.g.*, tr. 443), Dr. Maddox administered Toradol injections for pain when she saw Plaintiff in the office and prescribed Percocet and other medications (*see, e.g.*, tr. 434, 436, 438, 440), thus indicating that Plaintiff's pain continued and continued to the extent it required narcotic pain medications.

Finally, the ALJ's sixth reason—that Plaintiff's appearance and demeanor at her hearing were "generally unpersuasive"—is a reason the ALJ properly considered, assuming it is an accurate observation, but it cannot be the only reason to discount a claimant's subjective complaints. *See* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) ("The Secretary relied on substantial evidence, including demeanor evidence, to conclude that [the claimant's] complaints were not credible."); Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987) (citing Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985)); *see also* Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir.1990) (exclusive reliance on demeanor in credibility determinations is inappropriate, but it is not reversible

error to consider demeanor as one of several factors in evaluating credibility). Here, because the ALJ's other reasons for discounting Plaintiff's complaints lack substantial support in the record, the "demeanor" factor is insufficient to support the ALJ's ultimate credibility finding (that is, that Plaintiff is credible only to the extent her complaints are consistent with the RFC). Accordingly, the ALJ erred in making his credibility findings, and remand is thus appropriate due to this error as well. *See* Foote, 67 F.3d at 1562 (stating that an insufficient credibility finding is "a ground for remand when credibility is critical to the outcome of the case").

Therefore, upon remand the ALJ shall consider anew Plaintiff's subjective complaints of pain and other symptoms. Should the ALJ again find Plaintiff less than fully credible, he must specify his reasons for doing so, and the reasons must be supported by substantial evidence on the record as a whole.

VI.     CONCLUSION

The ALJ erred at step three in failing to explain his findings or identify the listing(s) he considered and in discounting Plaintiff's subjective complaints of pain and other symptoms. He also appears to have erred in considering the opinions of Dr. Maddox/ARNP Breland. As such, the Commissioner's final decision is not supported by substantial evidence on the record as whole, and this case must be remanded for further administrative proceedings. *See* 42 U.S.C. § 405(g); Foote, 67 F.3d at 1556 (remanding for additional administrative proceedings).

Accordingly, it is **ORDERED** that:

1.      Carolyn W. Colvin is substituted for Michael J. Astrue as Defendant in this action.

2.      Pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be **REVERSED**, the Commissioner is ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this order, and the Clerk directed to close the file.

At Pensacola, Florida this 8th day of August 2013.

*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**